ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
|---|---|
| COUNTY OF BEAUFORT | FOURTEENTH JUDICIAL CIRCUIT |
| Rebecca A. Landon,<br>　　　　　　　　Plaintiff,<br>vs.<br>Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union, LLC, Vaden of Beaufort, Inc., Ally Financial, Inc. and Navy Federal Credit Union,<br>　　　　　　　　Defendants. | Case No.<br><br>**SUMMONS** |

TO: THE DEFENDANTS ABOVE NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is hereby served upon you and to serve a copy of your Answer to the said Complaint on the subscriber, David A. Maxfield, Esquire, at his office at P.O. Box 11865, Columbia, South Carolina 29211, within thirty (30) days after service hereof, exclusive of the date of such service; and if you fail to answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the court for the relief demanded in the Complaint. If you fail to appear and defend, judgment by default will be rendered against you for the relief demanded in the Complaint.

　　　　　　　　　　　　　　　　DAVE MAXFIELD, ATTORNEY, LLC

　　　　　　　　　　　　　　　　_s/David A. Maxfield_
　　　　　　　　　　　　　　　　Dave Maxfield, Esq., SC Bar No. 7163
　　　　　　　　　　　　　　　　P.O. Box 11865
　　　　　　　　　　　　　　　　Columbia, SC 29211
　　　　　　　　　　　　　　　　(803) 509-6800
　　　　　　　　　　　　　　　　(855) 299-1656 (fax)
　　　　　　　　　　　　　　　　dave@consumerlawsc.com

DATED: June 25, 2021
Columbia, South Carolina

STATE OF SOUTH CAROLINA                IN THE COURT OF COMMON PLEAS

COUNTY OF BEAUFORT                     FOURTEENTH JUDICIAL CIRCUIT

Rebecca A. Landon,

                                           Plaintiff,

-vs-

Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union, LLC, Vaden of Beaufort, Inc., Ally Financial, Inc. and Navy Federal Credit Union,

                                          Defendants.

**COMPLAINT**

(Jury Trial Requested)

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

Plaintiff, complaining of the Defendants above named, would respectfully show:

## JURISDICTION

1. The State of Residence of Plaintiff is South Carolina.

2. Experian Information Solutions, Inc. ("Experian") is a foreign corporation with its principal place of business, "nerve center" and headquarters in the State of Texas.

3. Equifax Information Services, LLC is a foreign corporation with its principal place of business, "nerve center" and headquarters in the State of Georgia.

4. Trans Union, LLC ("Trans Union") is a foreign corporation with its principal place of business, "nerve center" and headquarters in the State of Illinois.

1

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

5. Vaden of Beaufort, Inc., ("Vaden") is a corporation organized under the laws of the State of Georgia, which owns real property and transacts business as a car dealership in Beaufort County, South Carolina.

6. Ally Financial, Inc., ("Ally") is a foreign banking corporation with its headquarters and nerve center in the State of Michigan.

7. Navy Federal Credit Union ("NFCU") is a credit union operating nationally with its headquarters and nerve center in the Commonwealth of Virginia.

8. This Court has jurisdiction over the parties and subject matter of this action and venue is proper.

## FACTUAL ALLEGATIONS

9. From 2012 through September of 2020, Plaintiff Rebecca Landon was a United States Marine Corps civilian employee.

10. In or around August of 2020, Plaintiff met a woman named Samantha Nottingham ("Nottingham") who represented that she owned a real estate development and ranching company called "The Eastern Westerner, LLC" and employed, among others, military veterans, and had locations in Fort Worth, Texas, and Hardeeville, South Carolina.

11. Nottingham offered Plaintiff a job as her assistant and Plaintiff accepted, beginning work in September of 2020.

12. Nottingham, who represented to Plaintiff and others that she had vast wealth had, in truth, a long history of fraudulent and deceptive activity. See, e.g., *Binder v. Nottingham and The Eastern Westerner*, LLC, et. al., 2021-CP- 07-00926.

13. Upon information and belief, Nottingham is now the subject of an ongoing investigation into her significant criminal activity.

14. As part of that activity, Nottingham used The Eastern Westerner, LLC primarily as a cover to steal funds from members of the public, potential investors, and ultimately her own employees. Besides soliciting investments and "temporary" loans, Nottingham

fraudulently used employee personal credit cards, and personal identifying information to commit identity theft.

15. As described hereinbelow, almost none of the criminal activity could have occurred absent the acts and omissions of Defendants, who enabled it.

**Vaden Allows Nottingham to Commit $176,064 in a Single Afternoon in Plaintiff's Name, with No ID and No Money Down.**

16. As a large motor vehicle dealer, Vaden is (or should be) acutely aware of the problem of identity theft, a societal problem that has nearly doubled in the last year, causing more than $3.3 Billion in losses in 2020.

17. According to the Federal Trade Commission (FTC), *"the identities of an estimated nine million US citizens are stolen each year. Identity theft related to major purchases like buying a car is common, considering the necessary identifying, banking, and credit information involved."* The FTC further notes that car dealerships have a *"target on their back when it comes to identity theft due to their access to sensitive consumer information."*

18. On December 30th and/or 31st, 2020, Nottingham went to Vaden's GMC dealership in Bluffton, South Carolina.

19. Nottingham identified herself as "Rebecca Landon," and stated that she was the owner of The Eastern Westerner.

20. Upon information and belief, Nottingham possessed no physical driver's license or other identification to show she was Landon.

21. Upon information and belief, the only identification Vaden ever received from Nottingham was a photocopy or email of Landon's driver's license (which Nottingham presumably obtained from Landon's personnel file).

22. According to her driver's license, Landon is 5'2" and weighs 115 lbs., while Nottingham, according to her March 2021 mugshot, is 5'8" and 161 lbs.

3

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

23. Overlooking the **half-foot height difference** and nearly **50 lb. weight discrepancy**, Vaden accepted both Landon's story at face value and contracted to sell to "Landon and The Eastern Westerner" as "co-buyers" a 2020 GMC Suburban (1GNSKFKD4MR137909) for **$80,526**, and a 2020 GMC Silverado for **$79,310** (1GC4YREY5MF156860),

24. With its model and sales year ending, Vaden then offered to sell (and Nottingham readily accepted) nearly every add-on product conceivable on both vehicles, including GAP insurance, "Three for One" vehicle service contracts, preferred prepaid maintenance contracts, Advanced Protection Limited Warranties, Roadside Service Memberships, and Key Replacement Coverage, which Nottingham happily accepted.

25. A portion of each of the above add-on products was retained by the dealer as a commission or other consideration.

26. These products added nearly $15,000 to the price of the vehicles and brought the total purchase price of the vehicles to **$176,064.**

27. Vaden then assisted Nottingham in obtaining financing (in Landon's name) with no money down.

28. From December 30 – 31st, 2020, Vaden pulled or caused Landon's credit files to be pulled at least 7 times.

29. Each pull dropped Landon's (previously excellent) credit score.

30. Vaden ultimately obtained obtaining approvals from GM Financial for the Suburban, and from Defendant Ally for the Silverado, both with The Eastern Westerner, LLC, and Landon as co-buyers.

31. The negligence of Vaden and Ally -besides that described above - extended to furnishing the very forms to Nottingham to commit the identity theft, including an Ally "corporate resolution" for the Eastern Westerner, and credit applications.

32. Neither Vaden nor Ally concerned themselves with the fact(s) that:

    a. the addresses on the applications did not match that on Landon's photocopied driver's license; or,

    b. Eastern Westerner was listed as a corporation formed in South Carolina (rather than Texas); or,

    c. Eastern Westerner was listed as having been in business for "1 year" but Landon had somehow been employed as its "Executive" for "2 years," or,

    d. Eastern Westerner's website and all publicly available information listed Nottingham (not Landon) as the owner / executive (and showed Nottingham's picture); or,

    e. Eastern Westerner listed no bank account and provided no financial statement; or,

    f. Eastern Westerner listed no state of incorporation, or,

    g. Nottingham's "Rebecca Landon" signature bore no resemblance to the signature on Landon's driver's license; and,

    h. Landon's credit application contained no prior address, no prior employer, no email address, no driver's license number, license state, and no prior occupation.

33. Before handing Nottingham the keys to both vehicles, Vaden completed its deal file with the notarization, by its employee, of a mostly blank Power of Attorney; the same employee notarized a "One in the Same Document" (intended presumably to verify identity) with no identification provided to her.

34. After taking delivery of the vehicles on December 31, 2020, Nottingham kept the Suburban for herself, and furnished the Silverado to Landon as a "company vehicle" that Landon had – as a benefit of her employment – the "right" to own after making 60 payments of $448.00 to the Eastern Westerner.

35. **Unbeknownst to Landon, the "company vehicle" she hoped one day to own was already titled, registered, and financed by Vaden and Ally in her own name.**

5

### Nottingham returns to Vaden for another $82,000 Bite at the Apple.

36. Having seamlessly obtained from Vaden more than $175,000 in vehicles with no money down and no questions asked, Nottingham began work on a third deal with Vaden for a second Silverado (1GC1YREY7MF160749) almost immediately.

37. On January 5, 2021, Vaden pulled Landon's Experian, Trans Union and Equifax credit files without her knowledge or consent for the new transaction.

38. To find financing, Vaden shopped the deal to TD Auto Finance, Bank of America, BBVA, and other lenders (all of whom pulled Landon's file themselves), before finally securing financing through First Citizens Bank.

39. On January 26, 2021, Nottingham returned to Vaden to take delivery of the second Silverado.

40. As before, Vaden accepted an incomplete credit application and required no physical identification card.

41. As before, Vaden sold a "luxcare" package, GAP coverage, a $3,977 vehicle service contract, preferred maintenance, and other add-ons, to its benefit.

42. The price of the vehicle as delivered with add-ons came to $85,140.00.

43. This third transaction indebted Landon to First Citizens for $81,890, and brought the total fraudulent indebtedness created by Nottingham and Vaden in 26 days to **$257,954.**

### Fraudulent charges appear on Landon's NFCU Credit Card Statement as Nottingham's Schemes Unravel

44. Because of her former work for the Marines, Landon had been a member in good standing of Navy Federal Credit Union since 2012.

45. Among her several NFCU accounts (which had exemplary payment histories commensurate with Plaintiff's excellent credit) Plaintiff had an NFCU credit card.

46. At the beginning of February, Plaintiff saw several charges on her credit card statement she did not recognize but which appeared to be related to a trip and other expenses of Nottingham in Texas.

47. Around the same time, Plaintiff received adverse action notices (required under the Equal Credit Opportunity Act) from the lenders to which Vaden had applied who did not grant credit.

48. On February 3, 2021, Plaintiff saw an unauthorized "inbound" transfer into her NFCU checking account (where her paychecks from Eastern Westerner were deposited) for $50,000.00.

49. In the next two days, Plaintiff received additional adverse action notices.

50. On February 6, 2021, Plaintiff, now suspicious of Nottingham's activities, reported to the police.

51. That same day, Plaintiff went personally to NFCU's branch in Beaufort and reported the suspicious charges and inbound wire transfer to NFCU. Defendant NFCU froze Plaintiff's account and promised to investigate.

52. Plaintiff resigned from the Eastern Westerner.

53. On February 9, 2021, Plaintiff notified Vaden she believed her identity had been stolen to buy the Silverado she had been given use of as a "company vehicle."

54. From February 9 – February 16th, Plaintiff contacted Vaden nine more times but got no response, despite leaving messages for (among others) the dealership's General Manager.

55. Plaintiff also tried to advise Vaden of the suspected fraud through its web portal but got no substantive response.

56. Finally, on February 16, Plaintiff spoke personally with an employee of Vaden. Rather than taking Plaintiff's concerns seriously, the employee ridiculed her and asked her if she was going into "the witness protection program."

57. That same day, Plaintiff learned from another Vaden employee that not one – but three – vehicles had been financed by Vaden in her name.

7

## Despite Actual Notice, Defendants Fail to Investigate

### a. NFCU

58. After being notified of a fraudulent $50,000 inbound transfer, and shutting down Plaintiff's checking account, NFCU promised to investigate charges on Plaintiff's credit card, as required by the Fair Credit Billing Act.

59. Despite Plaintiff's timely notice, within 60 days of the date said charges appeared on her statement, that they were false, on March 1, 2021, NFCU wrote Plaintiff and contended that "no error occurred," and that Plaintiff was responsible for all the charges.

60. On March 6, 2021, NFCU reported a balance due of $15,819 against Plaintiff's credit, with no notation of Plaintiff's dispute.

61. On March 9, 2021, NFCU's determination was challenged by her attorneys.

62. Despite the clear requirement that NFCU is required, under the FCBA, to explain its finding and provide documentation backing up that finding, it failed to do so, violating the FCBA.

### a. Ally

63. After learning of the foregoing, from February 16 - 18, 2021, Plaintiff contacted all three lienholders – Ally, GM Financial, and First Citizens – to advise that the vehicles had been purchased fraudulently using her identity.

64. Although GM Financial and First Citizens followed through (and did not report the accounts against Plaintiff's credit file) Ally was a different story.

65. Plaintiff initially had great difficulty communicating with Ally employees by phone due to a language barrier and contacted Ally again online.

66. Defendant Ally acknowledged Plaintiff's fraud dispute on February 18, 2021.

67. Ally also, verbally or otherwise, promised to investigate and provide documents related to the transaction (which, to date, it has not).

68. Instead, and despite knowledge of the fraud dispute, Ally continued to treat the account – and Landon – as just another customer.

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

69. However, despite acknowledging notice from Plaintiff, Ally did nothing to alter or cease reporting the account to credit reporting agencies, which it had only begun doing on February 14, 2021.

70. On March 7, 2021, with no permissible purpose, Ally pulled Landon's credit file for an "account review."

71. On March 9, 2021, Landon reminded Ally by written letter she was a fraud victim.

72. For the next two months, despite actual knowledge that the account was disputed as fraud, Ally continued to report it to credit reporting agencies with no mention it was disputed.

73. On May 13, 2021, Landon sent a detailed fraud package to Ally containing her fraud affidavit, true personal identifying information and ID, and the police report.

74. Despite the above three written notices from Landon, Ally would continue to report the debt against her for several more weeks – even "verifying" it as accurate to credit reporting agencies as "accurate" on May 21, 2021.

75. Ally finally agreed that the account should be deleted on June 10, 2021, after four months of reporting the **$89,220** debt against her.

## Credit Reporting Agencies Fail to Block
## Fraudulent Accounts, Addresses or Inquiries

76. Defendants Experian, Equifax and Trans Union are credit reporting agencies as defined by the Fair Credit Reporting Act.

77. Defendant CRA's are prohibited from providing credit reports to parties with no permissible purpose to view them.

78. Defendant CRA's must block fraudulent accounts from credit files upon being provided with a fraud affidavit or police report and identifying information.

79. Defendant CRA's are also required to investigate any information that a consumer disputes.

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

80. Defendant CRA's must provide reports free of charge in certain circumstances, including to fraud victims.

81. Upon information and belief, Defendants provided Plaintiff's file to numerous parties in December 2020 and January 2021 with no permissible purpose as (without such information) credit cannot generally be granted.

82. On February 19, 2021, Plaintiff obtained her Experian and Trans Union reports and discovered multiple unauthorized inquiries on her file (each of which affected her score negatively).

83. On March 5, 2021, Plaintiff obtained her Equifax file and found likewise.

84. On March 8, 2021, Plaintiff made written disputes to all three CRA's about false inquiries, addresses, and/or phone numbers on her file (including the false phone number Nottingham used with Vaden) and enclosed a copy of her ID information and Police Report.

85. In response, Defendant CRA's failed to remove some or all the false information.

86. Upon receiving her responses, Plaintiff saw on her Equifax and Experian reports that Ally had reported, with no notation of her dispute, an $89,220 debt.

87. Plaintiff could not see her Trans Union report, because Trans Union refused to provide an "additional free report" despite her status as a fraud victim, and despite weekly reports then available due to Covid 19 emergency.

88. On April 21, 2021, Plaintiff made a second dispute to Experian and Equifax that requested removal of the $89,220 Ally account, and the inquiries and new addresses that had appeared on file.

89. Experian received Plaintiff's dispute on April 23, 2021, at 12:05 p.m. However, rather than block the account as required within 4 days, upon information and belief Experian treated Plaintiff's fraud dispute as a "garden variety" account dispute and sent it on to Ally.

10

90. Ally received the disputes from Experian (and presumably Equifax). Although required to conduct a legitimate investigation, despite being on actual notice of Plaintiff's fraud dispute, Ally "verified" the accounts and neglected to mention it had received written disputes – and a Police Report – from Plaintiff.

91. Equifax received Plaintiff's dispute on April 25, 2021, at 9:26 a.m., but refused to block the disputed information.

92. Defendant Trans Union received Plaintiff's letter, again requesting her file as a fraud victim, on April 28, 2021, at 11:11 a.m. To date, it has provided no new report to Plaintiff.

93. As a direct and proximate result, Plaintiff's credit reports continue to contain false information and a score lowered wrongfully by multiple "hard" inquiries.

## DAMAGES

94. The wrongful acts of the Defendants described caused the following concrete and particularized harms and losses:
    a. Harm to existing and/or prospective credit, including the inability to replace her prior vehicle (sold when she was given use of a "company truck");
    b. Harm to reputation;
    c. Becoming unjustly indebted for more than a **quarter-million dollars**;
    d. Emotional distress including humiliation, fear, worry, anxiety, and depression, and the physical manifestations of same;
    e. Loss of enjoyment of life's normal activities;
    f. Over 250 hours spent attempting to rectify the harm caused by Defendants;
    g. Loss of her fundamental right to privacy and/or the right to be left alone;
    h. Such other harms and losses as may be shown at trial.

11

95. Defendants must pay all sums needed to compensate for all harms and losses proximately caused by the wrongful acts described, to return Plaintiff to the position enjoyed before wrongful injury.

96. For those harms and losses reasonably expected to continue into the future, Defendants must compensate for their expected continuing impact and effect,

97. Additionally, due to the intentional or reckless nature of the wrongful acts described, Defendants must pay nominal or symbolic damages, and punitive damages to punish said conduct, and deter its reoccurrence.

98. Defendants must further be required to pay attorney's fees and costs, and the penalties mandated by its violation of important statutory rights referenced below.

99. The harms and losses caused by Defendants are likely to be redressed by a favorable judicial decision, through an award of the above damages, assessment of fines and punitive damages, an award of attorney's fees and all litigation costs, and injunctive relief.

## FOR A FIRST CAUSE OF ACTION
## AS TO DEFENDANTS VADEN, NFCU & ALLY
### (Negligence)

100. The allegations contained hereinabove are repeated as if alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

101. Defendants owed Plaintiff a duty to exercise due care.

102. Defendants breached the duty to Plaintiff in the above particulars, and in such other particulars as shown at trial.

103. The breach of duty by Defendants was in conscious, reckless disregard of the rights of Plaintiff.

104. As a direct and proximate result of the negligent, careless, reckless, willful and wanton acts and omissions of the Defendants, damages were inflicted on Plaintiff.

105. As a result, judgment should be granted for both actual and punitive damages.

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

## FOR A SECOND CAUSE OF ACTION
## AS TO DEFENDANT VADEN
### (Negligent Hire and Supervision)

106. The allegations contained hereinabove are repeated as if alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

107. Defendant owed a duty to exercise care in the hiring (or contracting) and supervising persons to sell and finance vehicles, and to prevent against the prevalent crime of identity theft.

108. Defendant hired or selected unfit, incompetent persons unworthy of such assignment.

109. Defendant knew or should have known of the foregoing; Defendant failed to exercise care in its hiring or use of the persons, and in its supervision of them.

110. Defendant not only failed to discover the unfitness and dangerous propensities of their agent(s) or employee(s), but used them to its advantage, encouraged them, or failed to take corrective action after learning of the foregoing.

111. As a direct and proximate result of the negligence of Defendant, injuries have been inflicted upon Plaintiff that may be recovered by way of judgment for actual damages (including emotional and physical distress) punitive damages, costs and attorney's fees, and such other damages as shown at trial.

## FOR A THIRD CAUSE OF ACTION
## AS TO DEFENDANT VADEN
### (Violation of S.C. Code §56-15-10, et. seq.)

112. The allegations contained hereinabove are repeated as if alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

113. The definition of "dealer" or "motor vehicle dealer" in §56-15-10(h) applies to Defendant.

114. The acts of Defendant, constitute unfair and deceptive acts or practices.

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

115. Defendant engaged in multiple actions in bad faith, were unconscionable or which caused damages to any party or to the public and committed such other violations of Title 56 as may be shown at trial.

116. As a direct and proximate result of the above wrongful acts, the Court should grant a temporary and permanent injunction requiring Defendant to immediately refrain from the above conduct and grant an award of double the actual damages Plaintiff sustained, the costs of this suit, and reasonable attorney's fees.

117. Further, the acts constitute knowing and malicious conduct, an award should be made against Defendant for punitive damages not to exceed three times the actual damages.

## FOR A FOURTH CAUSE OF ACTION
## AS TO DEFENDANTS VADEN & ALLY
### (Violation of 15 USC §1681b, Impermissible Purpose)

118. The allegations contained hereinabove are repeated as if alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

119. The definition of "user" of information in the Fair Credit Reporting Act, as amended, applies to Defendants.

120. Defendants knowingly, willfully and/or negligently obtained the credit file of Plaintiff without a permissible purpose, in violation of 15 U.S.C. 1681b, and 1681q, and 1681r, et. seq.

121. As a direct and proximate result of the negligent and willful violations of the FCRA, Plaintiff suffered actual damages, including economic loss, invasion of privacy, emotional distress, and interference with normal and usual activities, for which Plaintiff should be awarded damages in an amount to be determined by the jury. 15 U.S.C. §§1681n and 1681o.

122. The Court should further award attorney fees under 15 U.S.C. §1681o(a).

## FOR A FIFTH CAUSE OF ACTION

## AS TO DEFENDANT ALLY

(Violation of 15 USC §1681s-2(b), Failure to Conduct Proper Investigation)

123. The above allegations are repeated and realleged herein as if set forth verbatim, to the extent not inconsistent with the allegations of this cause of action.

124. The definition of a "furnisher of information" contained in the Fair Credit Reporting Act, as amended, applies to the Defendant Ally.

125. After being notified by the Plaintiff and the consumer reporting agencies that derogatory information was disputed by the Plaintiff, Defendant failed to conduct timely or proper investigations of the disputed information as required by 15 U.S.C. 1681s-2(b).

126. Defendant negligently and willfully re-reported inaccurate information to the consumer reporting agencies, violating the provisions of the Fair Credit Reporting Act regarding reinvestigation.

127. Defendant further failed to note in its reporting that the account was "disputed" as required.

128. The action and inaction of Defendant caused great and irreparable injury to Plaintiff.

129. Defendant maliciously and/or with willful intent to injure, defamed Plaintiff and invaded the legitimate expectation of privacy of the Plaintiff.

130. Besides actual or compensatory damages, a judgment should be granted to Plaintiff in a sum to be assessed by the trier of fact for punitive/exemplary damages under state law, and/or for willful violations of the Fair Credit Reporting Act or other applicable federal laws.

## FOR A SIXTH CAUSE OF ACTION

## AS TO DEFENDANTS EXPERIAN, EQUIFAX & TRANS UNION

(Negligent Noncompliance with FCRA)

131. The allegations contained hereinabove are repeated as if alleged verbatim, to the extent not inconsistent with this cause of action.

132. Defendants prepared and furnished credit reports on Plaintiff that contain false information.

133. Plaintiff notified Defendants of the reporting false information, disputed that information, and asked Defendants to correct it.

134. Despite those disputes, Defendants continued to report false information.

135. Upon information and belief, the reporting is at present false and incorrect.

136. Defendants negligently violated the FCRA, including but not limited to the requirements in 15 U.S.C. §1681b, §1681c-2, §1681e and §1681i and, as to Trans Union, §1681g.

137. Because of the above failure to comply with the requirements of FCRA, Plaintiff suffered and will continue to suffer actual damages, including economic loss, denial of credit, lost opportunity to receive credit, damage to reputation, invasion of privacy, emotional distress, and interference with normal and usual activities, for which damages should be awarded in an amount to be determined by the jury.

138. The Court should further award attorney fees under 15 U.S.C. §1681o(a).

## FOR A SEVENTH CAUSE OF ACTION
## AS TO DEFENDANTS EXPERIAN, EQUIFAX & TRANS UNION
### (Willful Noncompliance with FCRA)

139. The allegations contained hereinabove are repeated as if alleged verbatim, to the extent not inconsistent with this cause of action.

140. Defendants prepared and furnished credit reports on Plaintiff that contains false information.

141. Plaintiff notified Defendants that of the reporting of false information, disputed that information, and asked Defendants to correct it. Despite those disputes, Defendants continued to report false information.

142. Defendants willfully violated the requirements of FCRA.

16

143. Because of the above willful violations of the FCRA, judgment should be granted for actual, statutory, and punitive damages.

144. The Court should further award attorney fees under 15 U.S.C. § 1681n(a).

## FOR AN EIGHTH CAUSE OF ACTION
## AS TO DEFENDANT NAVY FEDERAL
### (Violation of FCBA)

145. The allegations contained hereinabove are repeated as if alleged verbatim, to the extent not inconsistent with this cause of action.

146. The definition of a "creditor" as defined in the Fair Credit Billing Act, 15 U.S.C. § 1620(f) applies to Defendant.

147. Plaintiff gave Defendant written notice that charges claimed due by Defendant were disputed, under Regulation Z, 12 C.F.R. § 226.12(b)(3).

148. The actions of Defendant violated the Fair Credit Billing Act. These violations include, but are not limited to:
    a. Reporting the account to credit reporting agencies without satisfying the requirements of 15 U.S.C. § 1666(d) and by failing to report the account as disputed when supplying information to credit reporting agencies in violation of 15 U.S.C. § 1666a(a) and (b).
    b. Failing to promptly investigate disputed charges made against the account.
    c. Failing to respond to the consumer's challenge of Defendant's initial determination.

149. Because of these violations of the Fair Credit Billing Act, the right of Defendant to collect any part of the disputed amount, entitling Plaintiff to a judgment ordering the forfeiture of the disputed amount; as set forth hereinabove, and actual damages, statutory damages, costs, and attorney's fees, all in an amount to be determined by the trier of fact.

ELECTRONICALLY FILED - 2021 Jun 25 12:50 PM - BEAUFORT - COMMON PLEAS - CASE#2021CP0701171

## PRAYER FOR RELIEF

WHEREFORE, the prayer of the Plaintiff judgment in an amount sufficient to compensate Plaintiff for actual damages, with punitive damages, statutory damages, such interest as is allowable by law, costs, attorney's fees, and such other relief as is just and proper.

DAVE MAXFIELD, ATTORNEY, LLC

s/ David A. Maxfield

---

Dave Maxfield, Esq., SC Bar No. 7163
P.O. Box 11865
Columbia, SC 29211
(803) 509-6800
(855) 299-1656 (fax)
dave@consumerlawsc.com

June 24, 2021

| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
|---|---|
| COUNTY OF BEAUFORT | FOURTEENTH JUDICIAL CIRCUIT |

| Rebecca A. Landon, | |
|---|---|
| Plaintiff, | Case No. 2021-CP-07-1171 |
| vs. | CERTIFICATE OF SERVICE |
| Experian Information Solutions, Inc., Equifax Information Services, LLC, Trans Union, LLC, Vaden of Beaufort, Inc., Ally Financial, Inc. and Navy Federal Credit Union, | |
| Defendants. | |

I, the undersigned employee of Dave Maxfield, Attorney, LLC do hereby swear and affirm that on the 28th day of June 2021, I served the foregoing **Summons & Complaint**, by sending a copy of same by U.S Certified Mail, Restricted Delivery, Return Receipt Requested to the following:

Experian Information Solutions, Inc.
c/o C T CORPORATION SYSTEM
2 Office Park Court Suite 103
Columbia, South Carolina 29223

Equifax Information Services, LLC
c/o CORPORATION SERVICE COMPANY
508 Meeting Street
West Columbia, South Carolina 29169

Trans Union, LLC
c/o THE PRENTICE-HALL CORPORATION SYSTEM, INC
508 Meeting Street
West Columbia, South Carolina 29169

Vaden of Beaufort, Inc.
c/o Paracorp Incorporated
2 Office Park Court, #103
Columbia, South Carolina 29223

Ally Financial, Inc.
c/o C T CORPORATION SYSTEM
2 OFFICE PARK COURT SUITE 103
COLUMBIA, South Carolina 29223

Navy Federal Credit Union
c/o CORPORATION SERVICE COMPANY
100 Shockoe Slip Fl 2
Richmond, VA, 23219 - 4100

s/Janel Streater
Janel Streater

DATED: June 28, 2021
Columbia, South Carolina